**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| TRAVIS BEAVER, LUZ PINEDA, DENAH ALTOBELLI, and SUSANNE HANES, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs<br><br>v.<br><br>NISSAN OF NORTH AMERICA, INC, and NISSAN MOTOR CO., LTD.<br><br>        Defendants | Case No.: 3:22-cv-00785<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Travis Beaver, Luz Pineda, Denah Altobelli, and Susanne Hanes ("Plaintiffs"), by and through their attorneys, bring this action against Nissan of North America, Inc. and Nissan Motor Co., Ltd. ("Defendants" or "Nissan"), individually and on behalf of all others similarly situated, and alleges as follows:

## I.     INTRODUCTION

1.     Plaintiffs bring this action individually and on behalf of all similarly situated persons ("Class Members") who purchased or leased any Model Year ("MY") 2015 through 2021 Nissan Murano vehicle in the United States ("Class Vehicles") that was designed, manufactured, distributed, marketed, sold or leased by Defendants.

2.     Well before Nissan began manufacturing, marketing and distributing the Class Vehicles, Nissan knew that the Class Vehicles contained one or more design and/or manufacturing defects that can cause their continuously variable transmission ("CVT") to malfunction ("CVT Defect"). A "CVT" is a type of automatic transmission that does not use conventional gears to achieve the various ratios required during normal driving. Instead, it uses a segmented steel belt between pulleys that can be adjusted to change the reduction ratio in the transmission. This is supposed to occur smoothly and continuously. Like a conventional

transmission, a CVT is electronically controlled by a Transmission Control Module ("TCM"). On information and belief, the Class Vehicles all come equipped with the same or substantially similar CVT.

3.     The 2003 Nissan Murano was the first U.S. vehicle that Nissan equipped with a CVT. Since 2003, Nissan has implemented CVTs in many of its vehicles manufactured for the U.S. market. Nissan's widespread adoption of CVT technology, however, has been consistently plagued by design and manufacturing defects that render CVT-equipped Nissan vehicles unreliable and unreasonably dangerous to operate.

4.     Like many other Nissan owners, numerous Class Vehicle owners have reported a significant delay in their Class Vehicle's response while attempting to accelerate from both from a stop and while in motion. This delay in response is often accompanied by the engine revving while the driver depresses the gas pedal with little to no increase in vehicle speed. Class Vehicle owners have also experienced and reported stalling, jerking, lurching, juddering, and/or shaking while operating their Class Vehicles, as well as premature transmission failure.

5.     The CVT Defect has been documented to occur without warning during vehicle operation and poses an extreme and unreasonable safety hazard to drivers, passengers and pedestrians for obvious reasons. When a vehicle hesitates while in motion, the driver may be prevented from seamlessly changing lanes or merging into the flow of traffic, which increases the potential for a collision. Hesitation from a stop increases the risk of being rear-ended. Jerking and juddering can cause a driver to lose control of the vehicle while in motion. A loss of power or transmission failure can cause a vehicle to fail in the midst of traffic and/or leave the vehicle occupants stranded. All of these hazards create a significant risk of severe bodily harm.

6.     In addition to these obvious safety hazards, the cost to repair the CVT Defect can be exorbitant. The Class Vehicles thus differ materially from the product Nissan intended to sell. Nissan intended to produce vehicles with CVTs that shift smoothly and continuously. Instead, Nissan produced vehicles that do not accelerate when prompted to accelerate, and that shake, shudder, jerk and judder.

7. Plaintiffs are informed and believe, and based thereon allege, that Defendants knew the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation at the time of the sale and thereafter. Defendants have actively concealed the true nature and extent of the CVT Defect from Plaintiffs and the other Class Members, and failed to disclose it to them, at the time of purchase or lease and thereafter. Had Plaintiffs and prospective Class Members known about the CVT Defect, they would not have purchased the Class Vehicles or would have paid less for them.

8. The reason that Nissan concealed the CVT Defect was to encourage Plaintiffs and Class Members to purchase Nissan vehicles, including the Class Vehicles. Nissan committed to the CVT over a decade ago, equipping the bulk of its fleet with CVTs which it touted as superior. Nissan needed to foster the illusion that the CVT was not defective and better than ordinary transmissions to support its sales.

9. Plaintiffs are informed and believe, and based thereon allege, that despite notice of the CVT Defect from, among other things, pre-production testing, numerous consumer complaints, warranty data, dealership repair orders and prior experience with earlier model vehicles with the same or substantially similar CVTs, Defendants have not recalled the Class Vehicles to repair the CVT Defect, have not offered their customers a suitable repair or replacement free of charge, and have not offered to reimburse all Class Vehicle owners and leaseholders the costs they incurred relating to diagnosing and repairing the CVT Defect.

10. Plaintiffs are further informed and believe, and based thereon allege, that despite being on notice of the CVT Defect, Defendants regularly deny the existence of the CVT Defect until after consumers' five (5) years/60,000 miles New Vehicle Limited Warranty Powertrain Coverage ("Powertrain Warranty") has expired and require payment to repair the CVT Defect even while the Class Vehicles are under warranty. On information and belief, the average cost of a CVT replacement is in the range of $3,500. *See, e.g., Gann, et al. v. Nissan North America, Inc.*, No. 3:18-cv-00966 (M.D. Tenn.) (memorandum of law in support of unopposed motion

for preliminary approval of settlement concerning CVT defect in 2013-2016 Nissan Altima vehicles, Dkt. No. 62-1 at 16).

11.     Nissan knew of and concealed the CVT Defect that is contained in every Class Vehicle, along with the attendant dangerous safety problems and associated repair costs, from Plaintiffs and the other Class Members both at the time of sale or lease and thereafter.  As a result of their reliance on Defendants' omissions, owners and lessees of the Class Vehicles have suffered ascertainable loss of money, property, and/or loss in value of their Class Vehicles.

## II.     PARTIES

### A.     Plaintiffs

### Travis Beaver (Maryland)

12.     Plaintiff Travis Beaver resides in Hilton, New York.  In or around March 2019, Mr. Beaver purchased a new MY2018 Nissan Murano from Criswell Nissan in Germantown, Maryland.  Prior to purchase, Mr. Beaver spoke with a dealer sales representative about the vehicle, inspected the Monroney label posted by Nissan on the vehicle and test drove the vehicle. Mr. Beaver was never informed by the dealer sales representative that the vehicle suffered from the CVT Defect and relied upon this fact in purchasing the vehicle.  Had Mr. Beaver been informed that his vehicle suffered from the CVT Defect, he would not have purchased it.  Mr. Beaver's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranted by Nissan.

13.     Mr. Beaver's vehicle has exhibited the CVT Defect on numerous occasions.  For example, when attempting to accelerate Mr. Beaver's vehicle hesitates, jerks and shudders.  Mr. Beaver brought the vehicle to an authorized Nissan Dealer in Maryland to complain of the problems he was experiencing within the mileage and durational limits of his 5 year/60,000 mile Powertrain Warranty covering the CVT.  However, the dealer claimed that it could not replicate the problems and did not offer a repair or replacement.

14.     On information and belief, Mr. Beaver's vehicle is in the process of CVT failure and will require a CVT replacement.

15.     At all times, Mr. Beaver has driven his vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Luz Pineda (Massachusetts)**

16.     Plaintiff Luz Pineda resides in Revere, Massachusetts.  In or around July 2015, Ms. Pineda purchased a new MY2015 Nissan Murano from Kelly Nissan in Lynnfield, Massachusetts.  Prior to purchase, Ms. Pineda spoke with a dealer sales representative about the vehicle, inspected the Monroney label posted by Nissan on the vehicle and test drove the vehicle.  Ms. Pineda was never informed by the dealer sales representative that the vehicle suffered from the CVT Defect and relied upon this fact in purchasing the vehicle.  Had Ms. Pineda been informed that her vehicle suffered from the CVT Defect, she would not have purchased it.  Ms. Pineda's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranted by Nissan.

17.     Ms. Pineda's vehicle has exhibited the CVT Defect on numerous occasions and she is concerned for her safety when she drives.  For example, when attempting to accelerate from a stop and while in motion, Ms. Pineda's vehicle jerks.  When Ms. Pineda is driving on the highway and depresses the gas pedal to accelerate, her vehicle will jerk or jolt.  As a result, Ms. Pineda is afraid she will run into the car ahead of her.  The vehicle also jerks when Ms. Pineda shifts into reverse or attempts to speed up after slowing down (i.e., without coming to a complete stop).  In addition, the vehicle hesitates when Ms. Pineda attempts to accelerate from a stop.  This scares Ms. Pineda because she is concerned that she may be rear ended or have trouble crossing an intersection in time.  These symptoms have become more frequent over time and now occur each time Ms. Pineda drives her vehicle.

18.     On information and belief, Mr. Beaver's vehicle is in the process of CVT failure and will require a CVT replacement.

19.     At all times, Ms. Pineda has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Denah Altobelli (Florida)**

20.     Denah Altobelli resides in Coral Springs, Florida.  In or around October 2015, Ms. Altobelli purchased a new MY2015 Nissan Murano from Harbor Nissan in Port Charlotte, Florida.  Prior to purchase, Ms. Altobelli spoke with a dealer sales representative about the vehicle, inspected the Monroney label posted by Nissan on the vehicle and test drove the vehicle. Ms. Altobelli was never informed by the dealer sales representative that the vehicle suffered from the CVT Defect and relied upon this fact in purchasing the vehicle.  Had Ms. Altobelli been informed that her vehicle suffered from the CVT Defect, she would not have purchased it.  Ms. Altobelli's vehicle was designed, manufactured, sold, distributed, advertised, marketed and warranted by Nissan.

21.     Ms. Altobelli's vehicle exhibited the CVT Defect and, ultimately, required a complete CVT replacement.  Prior to her CVT replacement, Ms. Altobelli's vehicle developed a judder.  In our about the end of August 2022, Ms. Altobelli's vehicle began juddering and then died leaving her stranded in the middle of the street.  Ms. Altobelli was forced to push the vehicle to the side of the road and had it taken at Aaction Transmission, a nearby transmission repair shop ("Aaction").  Aaction replaced the entire CVT assembly, noting the vehicle had stored the following Diagnostic Trouble Code "DTC" - "TRANSMISSION CODE – P17F1 CVT JUDDER (C/V CHECK)."  As discussed below, Nissan has issued numerous Technical Service Bulletins ("TSBs") to its dealers regarding this condition over the years.  Although Ms. Altobelli's repair was covered by an extended service contract, she was forced to pay a $250 deductible for her repair.  Additionally, she was provided with a "remanufactured" CVT which, on information and belief, is similarly defective.

22.     At all times, Ms. Altobelli has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Susanne Hanes (California)**

23.     Susanne Hanes resides in California.  In May 2020, Ms. Hanes purchased a MY2018 Nissan Murano from Empire Nissan in Ontario, California, an authorized Nissan

dealership. The vehicle had approximately 43,000 miles on the odometer at the time of purchase. An Empire Nissan employee recommended Ms. Hanes return at 65,000 miles for transmission service free of charge.

24.     Passenger safety and reliability were significant factors in Ms. Hanes' decision to purchase her vehicle. At the Nissan dealership, and prior to purchasing her car, Ms. Hanes reviewed written materials regarding the vehicle, including the Nissan-authored window "Monroney" label. Ms. Hanes also spoke with dealership personnel regarding the vehicle before purchase and test drove her vehicle with a dealership salesperson before purchase. Ms. Hanes was never informed by the dealer sales representative that the vehicle suffered from the CVT Defect and relied upon this fact in purchasing the vehicle. If any of Nissan's advertisements or marketing materials had accurately disclosed the CVT Defect, moreover, it is likely the defect would have been sufficiently widely reported that Ms. Hanes would have learned of the CVT Defect through her research, the materials she viewed at the dealership, or in her conversations with salespeople at the dealership before she purchased the vehicle. Had Ms. Hanes been informed that her vehicle suffered from the CVT Defect, she would not have purchased it.

25.     After she had driven an additional 7,000 miles, Ms. Hanes discovered that her vehicle was exhibiting hesitation when attempting to accelerate, jerking, and shuddering. She returned to Empire Nissan complaining of these symptoms. However, no repairs were performed.

26.     Ms. Hanes' vehicle thus continues to exhibit the above symptoms; specifically, hesitation when attempting to accelerate, jerking, and shuddering.

27.     At all times, Plaintiff Hanes has driven her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

   **B.    Defendants**

   **Nissan North America, Inc.**

28.     Defendant Nissan North America, Inc. ("NNA") is a California corporation with its principal place of business located at One Nissan Way, Franklin, Tennessee 37067 and doing business in Tennessee and throughout the United States.

**Nissan Motor Co., Ltd.**

29. Founded in 1933 and headquartered in Yokohama, Japan, Defendant Nissan Motor Co., Ltd. ("NML") is a corporation organized under the laws of Japan. NML manufactures and distributes automobiles and related parts. It also provides financing services. NML delivers a comprehensive range of products under various brands that are manufactured in Japan, the United States, Mexico, the United Kingdom and other countries. NML is the parent and 100% owner of NNA.

30. At all relevant times, NNA and NML were engaged in the business of designing, manufacturing, marketing, distributing, and selling automobiles, including but not limited to the Class Vehicles, and other motor vehicles and motor vehicle components, in Tennessee and throughout the United States.

31. Whenever, in this Complaint, reference is made to any act, deed or conduct of Defendants, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants.

### III.    JURISDICTION

32. This is a class action.

33. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed the sum value of $5,000,000, exclusive of interests and costs. This court also has federal question jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims under the Magnuson-Moss Act arise under federal law. This Court has personal jurisdiction over NNA because its principal place of business is in Franklin, Tennessee, and Defendants' otherwise have sufficient minimum contacts with Tennessee, and/or otherwise intentionally avails themselves of the markets within Tennessee, through the promotion, sale, marketing and distribution of their

vehicles in Tennessee, so as to render the exercise of jurisdiction by this Court proper and necessary.

## IV.  VENUE

34.    Venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within the Middle District of Tennessee.

## V.    NISSAN'S KNOWLEDGE OF THE CVT DEFECT

35.    For years, Nissan has designed, manufactured, distributed, sold, and leased the Class Vehicles.  Upon information and belief, Defendants have sold, directly or indirectly through dealers and other retail outlets, many thousands of Class Vehicles nationwide.  On information and belief, the only method Nissan makes available for the purchase of Class Vehicles is through its nationwide network of authorized dealers.

36.    Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Nissan and its dealerships; specifically, they are the intended beneficiaries of Nissan's warranties.  The dealerships were not intended to be the ultimate consumers of the Class Vehicles, and the warranty agreements were designed for and intended to benefit the ultimate consumers only.

37.    The CVT Defect causes the Class Vehicles' to unexpectedly malfunction by hesitating, stalling, jerking, lurching, revving, shaking, juddering and/or failing prematurely.  The CVT Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous to consumers due to, *inter alia*, the impact of the Defect on driver's ability operate the Class Vehicle as expected.

38.    Plaintiffs are informed and believe, and based thereon allege, that, prior to placing the Class Vehicles in the stream of commerce, Nissan became aware of the CVT Defect through sources not available to Plaintiffs and Class Members in its exclusive control and/or superior knowledge, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer

complaints made exclusively to Nissan's network of dealers and directly to Nissan, aggregate warranty data compiled from Nissan's network of dealers, testing conducted by Nissan in response to consumer complaints, and repair order and parts data received by Nissan from Nissan's network of dealers. On information and belief, Nissan actively monitors and records consumer complaints made to Nissan's network of dealers as well as all service and repair work done related to the CVT Defect at its network of dealers.

39.     Nissan actively monitors and records all in-warranty repair work performed by its dealers which is fed to Nissan and meticulously tracked on a VIN-level basis. Nissan engineers track warranty trends using multiple metrics and are aware of even slight upticks in warranty rates. On information and belief, the internal triggers set by Nissan for investigation of claims rates are very low. James ("Jim") Blenkarn, Nissan's Senior Manager, Systems Quality Improvement, has publicly confirmed Plaintiffs' allegations. Blenkarn, in response to the question "On how Nissan monitors quality after a vehicle is launched, stated:

> For the first six months, sometimes longer, of every new product, we have a team that focuses strictly on the product and examines every claim that comes in for that vehicle model. Our engineers have to target reporting if it is a 0.5 incident rate. That's our threshold.[1]

40.     Nissan's CVT technology has been plagued with the same or similar recurrent problems (*i.e.*, hesitation, shaking, juddering, premature failure, etc.) for over a decade. In 2009 Nissan voluntarily doubled the powertrain warranty coverage of 5 years/60,000 miles to 10 years/120,000 miles for a large part of its fleet, including the MY2003-2010 Murano; MY2007-2010 Versa SL; MY2007-2010 Sentra; MY2007-2010 Altima; MY2007-2010 Maxima; MY2008-2010 Rogue; and MY2009-2010 Cube.[2] Nissan also reported that "in the unlikely event

---

[1] "5 Minutes with… Jim Blenkarn, senior manager, systems quality improvement, Nissan North America" Richard Truett, April 16, 2018 *Automotive News*. http://www.autonews.com/article/20180416/RETAIL05/180419990/5-minutes-with-jim-blenkarn-senior-manager-systems-quality

[2] Frequently Asked Questions, available at: https://web.archive.org/web/20100323050249/http://www.nissanassist.com/faqs.php?menu=3.

that your vehicle's transmission should need repair beyond the extended warranty period we are working to decrease the cost of repair."[3]

41. Nissan continued to experience such trouble with its CVTs that in December 2013 Nissan's then-CEO, Carlos Ghosn, announced that Nissan would increase its oversight of CVT supplier JATCO, Ltd., in which Defendant Nissan Motor Co., Ltd. holds a 75% ownership interest.[4] Nissan further explained that it was necessary to increase its oversight of JATCO because continued customer service issues had begun to cut into Nissan's profits.[5] CVT issues, however, continue to plague Nissan vehicles.

42. TSBs issued by Nissan to its dealers, and other remedial actions it has taken concerning the Class Vehicles and other vehicles with the same or substantially similar CVT, evidence Nissan's knowledge of the CVT Defect.

43. On information and belief, the Class Vehicles (MY2015-2021 Nissan Murano) have a same or a substantially similar transmission as other recent-model Nissan vehicles equipped with a CVT. Nissan has extended the warranty on many of these vehicles from five years/60,000 miles to seven years/84,000 miles and offered to reimburse owners and lessees who paid for transmission-related repairs during the extended warranty period in connection with class action settlements. *See, e.g.*, *Gann, et al. v. Nissan North America, Inc.*, Case No. 3:18-cv-00966 (M.D. Tenn.) (warranty extension and reimbursement program applicable to MY2013-2016 Nissan Altima vehicles equipped with a CVT); *Stringer, et al. v. Nissan North America, Inc.*, Case No. 3:21-cv-00099 (M.D. Tenn.) (warranty extension and reimbursement program MY2014-2018 Nissan Rogue and MY2015-2018 Nissan Pathfinder vehicles equipped with a CVT). Nissan has offered no such relief to owners and lessees of the Class Vehicles.

---

[3] *See* Customer Satisfaction Program, CVT Program Details available at: https://web.archive.org/web/20100124032242/http://www.nissanassist.com/ProgramDetails.php?menu=2.

[4] Nissan Presses Jatco to end CVT glitches, Automotive News at: https://www.autonews.com/article/20131202/OEM10/312029972/nissan-presses-jatco-to-end-cvt-glitches (Dec. 2, 2013).

[5] *Id.*

44.     Nissan has issued scores of TSBs for the Class Vehicles' CVTs.   In many instances, Nissan simply updated these TSBs to include later-model vehicles as it continued to manufacture CVTs with the same fundamental flaws.   The example TSBs discussed below are attached hereto as **Exhibit 1**.

45.     For example, on September 10, 2015, Nissan issued TSB NTB15-015b titled "PATHFINDER, QUEST, MURANO, MAXIMA, ALTIMA V6 CVT JUDDER AND DTC P17F0 OR P171F1 STORED." (Emphasis added).   This TSB was applicable to the MY2015 Murano, MY2013-2015 Pathfinder, MY2015 Altima, MY2015 Quest, and MY2016 Maxima, in the event that "[t]he customer reports a transmission judder (shake, shudder, single or multiple bumps or vibration)" and DTC P17F0 or P17F1 (both relating to CVT judder) is stored.   This TSB prescribes various service procedures, including but not limited to complete replacement of the CVT assembly.   This TSB was updated numerous times during the Class Period to include new models as they were brought to market.   For example, on March 31, 2016 Nissan issued NTB15-015e which was updated to include the MY2015-2016 Murano, MY2013-2016 Pathfinder, MY2013-2016 Altima, MY2015-2016 Quest and MY2016 Maxima.

46.     Notably, the CVT judder addressed by NTB15-015b and its subsequent iterations was nothing new—it had haunted CVT-equipped Nissan for years.   For example, on September 27, 2012, years before the Class Vehicles, Nissan rolled out a service campaign to address transmission judder in the MY2013 Nissan Altima.   *See* NTB12-081 and Nissan Owner Letter CSC-10046602-2184.   It did not work, but Nissan continued to produce Altimas and other vehicles with defective CVTs.   Also by way of example, on September 10, 2013, again years before the Class Vehicles, Nissan issued NTB13-086 applicable to MY2013-2014 Nissan Pathfinder and Altima vehicles, prescribing various fixes to address transmission judder.   The MY2013-2016 Altima, MY2013-2016 Altima and MY2015-2016 Murano were all later included in NTB15-015e concerning the unresolved judder issue.   The fact that the earlier-model Nissan Altima and Pathfinder vehicles were included in the same TSB with later-model Nissan Murano vehicles is evidence that they share substantially similar CVTs.   Nissan's experience with CVT

problems in these earlier model vehicles placed Nissan on notice of the issues that would later be encountered by the Class Vehicles.

47. On March 31, 2016, Nissan issued NTB12-103c titled "CVT/TCM CALIBRATION DATA 'WRITE' PROCEDURE" applicable to the MY2015-2016 Murano, MY2013-2016 Altima, MY2013-2016 Pathfinder, MY2015-2016 Quest, MY2014-2016 Rogue, and MY2016 Maxima. This TSB prescribes a TCM software calibration procedure to be performed when a complete CVT is replaced, or a CVT control valve (valve body) is replaced, or a TCM is replaced. On information and belief, it was necessary for Nissan to issue this TSB due to the large volume of such replacements. This TSB was updated numerous times to include later model years. *See, e.g.*, NTB12-013f issued on November 8, 2018 and applicable to the MY2015-2018 Murano, among other CVT-equipped vehicles.

48. On April 5, 2016 Nissan issued NTB15-014b titled "ENHANCED DIAGNOSTIC LOGIC FOR CVT JUDDER" applicable to the MY2015 Murano, MY2013-2015 Pathfinder, MY2013-2015 Altima, MY2015 Quest, and MY2016 Maxima. This TSB prescribes a procedure for reprogramming the TCM to enhance the diagnostic process in the event that a "customer reports a transmission judder (shake, shudder, single or multiple bumps or vibration.)" On information and belief this enhanced diagnostic process was developed because of the many consumers who were experiencing such issues.

49. Two days later on April 7, 2016, Nissan issued TSB NTB15-013b titled "NISSAN; PROCEDURE TO CLEAN CVT TRANSMISSION FLUID COOLERS" applicable to the MY2015-2016 Murano, MY2013-2016 Pathfinder, MY2013-2016 Altima, MY2015-2016 Quest, MY2016 Maxima and MY2014-2016 Rogue. This TSB cautions:

> **IMPORTANT**: Metal debris and friction material may become trapped in the radiator, cooling hoses, bypass valve or external CVT fluid cooler. This debris can contaminate the newly serviced transmission, control valve or torque convertor. In severe cases this debris can block or restrict flow and may cause damage to the newly serviced CVT.

This TSB goes on to advise technicians that when a CVT, control valve or torque convertor replacement is necessary the transmission fluid coolers must be flushed. On

information and belief, blocked or restricted flow can cause many of the issues experienced by Class Members, including hesitation, loss of power and a rough ride.

50. This TSB was amended multiple times and includes all Murano model years from 2015 through 2020. *See* TSB NTB15-013F issued February 19, 2021. The original version of this TSB, NTB15-013, was published on March 12, 2015, and applicable to MY2013-2014 Nissan Pathfinder and Altima vehicles. The history of this bulletin is similarly emblematic of the way that Nissan has approached CVT issues. Nissan's knowledge of this issue remained constant through time, as did its vehicles susceptibility to it. Nissan simply revised this bulletin to include successive models rather than remedy the problem.

51. On August 3, 2018, Nissan issued TSB NTB18-055 titled "CVT FLUID QUICK CHECK GAUGE" applicable to the MY2015-2018 Murano, MY2013-2018 Altima, MY2016-2018 Maxima, MY2013-2019 Pathfinder, MY2015-2017 Quest, MY2014-2018 Rogue, MY2017-2018 Rogue Sport, and MY2017-2018 Sentra Turbo. This TSB indicates that each dealer has been shipped a special tool called a CVT8 Oil Level Quick Check Gauge (J-51155), a specialized type of "dipstick" which allows for exact measurement of transmission fluid level. On information and belief, it was necessary for Nissan to provide dealers with this special tool because its CVTs are prone to leaking transmission fluid and their performance is extremely sensitive to the level of fluid present. Improper transmission fluid levels can cause belt slippage resulting in hesitation, loss of power and/or a rough ride and, ultimately, transmission failure. This TSB was amended to include later model years, including the MY2015-2021 Murano. *See* NTB18-055E issued July 13, 2021.

52. On March 9, 2022, Nissan issued NTB17-039O titled "CVT JUDDER AND DTC P17F0 OR P17F1 STORED" applicable to the MY2015-2021 Murano, MY2013-2018 Altima, MY2016-2021 Maxima, MY2013-2020 Pathfinder, and MY2015-2017 Quest. This TSB prescribes various service procedures in the event that the customer reports a transmission judder and DCT P17F0 or P17F1 is stored. This TSB was first published on April 27, 2017 (see NTB17-

039) and is extremely similar to NTB15-015b, issued years earlier (*see* discussion of NTB15-015b, *infra*).

53.     TSBs are generally developed over significant periods of time to address problems.  The process, in broad strokes, works as follows.  First, an issue is spotted, often through tracking of warranty claims and customer complaints.  Then, an investigation is performed to determine root cause.  This often involves the retrieval and testing of parts in the field (*i.e.*, the collection of failed components).  Then, a fix is developed and tested.  Only once these steps have been taken does a TSB issue.  On information and belief, each TSB issued by Nissan is approved by multiple people in the chain of command including managers, directors and/or other executives.  Discovery will show that such individuals knew, or should have known, about the CVT Defect, but refused to disclose the CVT Defect to prospective purchasers and owners of the Class Vehicles, and/or actively concealed the CVT Defect.

54.     Overall, and in summation, Nissan's CVT is a fundamentally flawed technology that has never functioned properly and has consistently exhibited the CVT Defect for over a decade, including juddering, hesitation and loss of power.  Nissan has been unable to develop a permanent solution for these issues but has nevertheless continued to use the CVT, simply updating TSBs to include newer models.  Prior TSBs and prior customer complaints regarding Nissan CVT-equipped vehicles are strikingly similar to those concerning the Class Vehicles.

55.     Accordingly, given the seriatim TSBs dealing with the CVT Defect, Nissan cannot plausibly assert that it was unaware of the nature of the Defect.

56.     Nissan has continued to issue TSBs addressing Class Vehicle CVT issues.

57.     On information and belief, Defendants issued the above TSBs to address problems being caused by the CVT Defect.  Defendants had and have a duty to disclose the CVT Defect and the associated repair costs to Class Vehicle owners, among other reasons, because the Defect poses an unreasonable safety hazard; because Defendants had and have exclusive knowledge and/or access to material facts about the Class Vehicles and their CVTs that were and are not known to or reasonably discoverable by Plaintiffs and other Class

Members; and, because Defendants have actively concealed the CVT Defect from their customers. Further, because the none of the above TSBs were issued as part of a formal recall, they were much more likely to be overlooked by dealers, and unknown to consumers.[6]

## VI. EXAMPLE CONSUMER COMPLAINTS

58. Hundreds, if not thousands, of purchasers and lessees of the Class Vehicles have experienced the CVT Defect.

59. Nissan monitors consumer complaints made to the National Highway Traffic Safety Administration ("NHTSA") and, on information and belief, elsewhere on the Internet. Federal law requires automakers like Nissan to be in close contact with the NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to the NHTSA, including field reports, customer complaints, and warranty data. *See* Transportation Recall Enhancement, Accountability and Documentation ("TREAD") Act, Pub. L. No. 106-414, 114 Stat.1800 (Nov. 1, 2000).

60. Attached hereto as **Exhibit 2** are example complaints filed by consumers with the NHTSA and which continue to accrue demonstrate that the CVT Defect is a widespread, dangerous and unresolved problem that has continued with Nissan CVT-equipped Murano vehicles through time unabated from one model year to the next from before the introduction of the Class Vehicles.[7]

61. Attached hereto as **Exhibit 3** are example NHTSA complaints posted prior to the Class Period (*i.e.*, prior to 2015) concerning the MY2013 Nissan Altima and Pathfinder, both of which were later included in many of the same TSBs as the Class Vehicles and, on information and belief, have a substantially similar CVTs. The striking similarity between these

---

[6] When a vehicle identification number is entered into a dealer computer, the dealer is automatically instructed to perform applicable recalls. Dealers generally search for TSBs based on customer complaints, which requires them to often sift through multiple TSBs and attempt to interpret which, if any, are applicable.

[7] Spelling and grammatical mistakes reproduced as in the original.

complaints and those concerning the Murano provide further evidence that Nissan was aware of the problems afflicting the Murano's CVT before the sale of the Class Vehicles.

62.     Although Defendants were aware of the widespread nature of the CVT Defect in the Class Vehicles, and the grave safety risk posed by it, Defendants took no steps to notify customers of the CVT Defect or to provide them with any relief.

63.     Customers have reported the CVT Defect in the Class Vehicles to Defendants directly and through its dealers.  As a result of these reports and its own internal testing, among other things, Defendants were fully aware of the CVT Defect contained in the Class Vehicles throughout the Class Period.  Nevertheless, Defendants actively concealed the existence and nature of the CVT Defect from Plaintiffs and the other Class Members at the time of purchase or repair and thereafter.  Specifically, Defendants:

a.     failed to disclose and/or actively concealed, at and after the time of purchase or repair, any and all known material defects or material nonconformities of the Class Vehicles, including the CVT Defect;

b.     failed to disclose and/or actively concealed, at and after the time of purchase or repair, that the Class Vehicles and their CVTs were not in good working order, were defective, and were not fit for their intended purpose; and

c.     failed to disclose and/or actively concealed, at and after the time of purchase or repair, the fact that the Class Vehicles and their CVTs were defective, despite the fact that Defendants learned of such defects as early as 2013, if not before.

64.     Defendants have deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at its dealerships or other third-party repair facilities and/or take other remedial measures related to the CVT Defect contained in the Class Vehicles.  Moreover, on information and belief, when vehicles are brought to Defendant's dealers for repair, Class Members are provided with ineffective repairs in which one defective component is replaced with another.  As a result, Class Members continue to experience the CVT Defect even after paying for repairs.  Because many Class Members, like

Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing) and diminution in value is not sufficient. A remedial scheme which also makes available a fix and/or warranty extension covering future failures is necessary to make Class Members whole.

65.     Defendants have not recalled the Class Vehicles to repair the CVT Defect, have not offered to their customers a suitable repair or replacement of parts related to the CVT Defect free of charge, and have not offered to reimburse Class Vehicle owners and leaseholders who incurred costs for repairs related to the CVT Defect.

66.     Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

67.     As a result of the CVT Defect, the value of the Class Vehicles has diminished, including without limitation the resale value of the Class Vehicles. Reasonable consumers, like Plaintiffs, expect and assume that a vehicle's CVT is not defective and will not place vehicle's occupants at an increased risk of an accident. Plaintiffs and Class Members further expect and assume that Defendants will not sell or lease vehicles with known safety defects, such as the CVT Defect, and will disclose any such defect to its customers prior to selling or leasing the vehicle, or offer a suitable repair. They do not expect that Defendants would fail to disclose the CVT Defect to them, and continually deny the defect.

## VII.     TOLLING OF THE STATUTE OF LIMITATIONS

68.     Plaintiffs and the other Class Members were not reasonably able to discover the CVT Defect, despite their exercise of due diligence.

69.     Despite their due diligence, Plaintiffs and the other Class Members could not reasonably have been expected to learn or discover that they were deceived and that material information concerning the Class Vehicles and their CVT was concealed from them.

70.     In addition, even after Class Members contacted Nissan and/or its authorized agents for vehicle repairs concerning the defective nature of the Class Vehicles and their CVTs,

they were routinely told by Nissan and/or through their authorized agents for vehicle repairs that the Class Vehicles are not defective.

71.     Nissan did more than fail to disclose the CVT Defect. Rather, it actively concealed the Defect to hide the truth from the public and promoted the false narrative that its CVT was a superior, smooth running product. Nissan did so because it was and remains heavily invested in the CVT given that it holds a 75% ownership stake in CVT supplier JATCO and has equipped the bulk of its fleet with CVTs for over a decade. The following are examples of Nissan's active concealment.

72.     As noted above, automobile manufacturers are obligated under TREAD to disclose safety-related defects NHTSA. Nissan made the conscious decision to violate this obligation and not disclose the CVT Defect to federal regulators notwithstanding its legal obligation to do so.

73.     On September 9, 2013 Nissan posted a video concerning the CVT on Youtube which touted the technology with glowing praise:

> Imagine this, an automatic transmission so innovative it doesn't even use gears. It's Nissan's Xtronic Continuously Variable Transmission, an industry breakthrough for building fuel efficient cars with uncompromised performance. While other car makers are just starting to introduce CVTs, we've had them in our lineup for twenty years, constantly advancing the technology. As a result, our newest CVTs are setting the benchmark for automatic transmissions, with amazingly smooth power and outstanding fuel efficiency. According to the old school of thought, to improve performance you just keep adding gears. CVT virtually eliminates them, using instead a single metal belt that runs around a pair of variable diameter pulleys. And once a transmission isn't limited by fixed gears, it can operate far more effectively. So whatever your right foot asks for, CVT responds with a perfect engine speed. Just how good is CVT? Consider this: The rule makers at Formula One Racing actually banned the transmission. It's like cheating! Conventional automatics hunt for the right gear going up a hill, jumping between third and fourth when it really needs to be in, say, three-and-a-half. Well, because CVT chooses from a much wider range of ratios it can nail that in between spot and hold it as you make a steady, smooth climb to the top. Accelerating with a conventional automatic, the transmission shifts as the power builds with a loss of power every time the needle drops. With CVT its like riding the perfect wave. Power builds on one continuous swell with no drop in RPM. Acceleration is so smooth and linear it feels effortless.[8]

---

[8] *See* https://www.youtube.com/watch?v=-SQXPTcr7I0

74. In the Press Kit for the 2015 Murano Nissan stated:

The 2015 Murano is available with a standard 3.5 liter DOHC V6 rated at 260 horsepower and 240 lb-ft of toque. Also standard is an advanced Xtronic transmission tuned for quick response and smoothness. The Xtronic holds the engine at the ideal rpm for the conditions at hand, offering responsive power for passing when needed and quiet efficient running at cruising speeds or around town[9]

The Press Kit for the 2016 through 2020 Murano contain the same language.[10]

75. In an October 18, 2019 post tilted "THE XTRONIC CONTINUOUSLY VARIABLE TRANSMISSION" Nissan provided the following description of the CVT:

The Continuously Variable Transmission (CVT) provides simple, efficient power delivery creating better fuel economy than traditional transmissions. With CVT, shifting is seamless – the vehicle performs as though it has a variable gear for every driving situation, and you won't feel any shift shock. It uses a steel belt or chain and a pulley system to move up and down the gear ratio in continuously smooth motion, providing seamless, stronger acceleration and increased fuel economy.[11]

76. On information and belief, Nissan has counseled its dealers to promote the myth that the CVT is superior and not admit its deficiencies. As a result, when Class Members bring their vehicles in complaining of CVT issues, they are often told they cannot be helped since the issues can't be duplicated and are denied warranty coverage, even though the dealers are fully aware of the CVTs shortcomings.

---

[9] *See* https://usa.nissannews.com/en-US/releases/release-45d4f96d5c4f4f5e81e3c02c4c70622c-us-2015-nissan-murano-press-kit#

[10] See https://usa.nissannews.com/en-US/releases/release-353f7db2795c4ebfb526d98aeedda68c-us-2016-nissan-murano-press-kit; https://usa.nissannews.com/en-US/releases/release-0b07530bd8ec4d40aa79ca6336efca83-us-2017-nissan-murano-press-kit; https://usa.nissannews.com/en-US/releases/release-79798d14bfc445bead08bcb5ee0b5535-us-2018-nissan-murano-press-kit; https://usa.nissannews.com/en-US/releases/release-9d44defcc1675489faa7a9b87e918500f-us-2019-nissan-murano-press-kit; https://usa.nissannews.com/en-US/releases/2020-nissan-murano-press-kit.

[11] *See* https://www.nissanusa.com/experience-nissan/news-and-events/xtronic-cvt-continuously-variable-transmission.html

77.     By failing to report the CVT Defect to NHTSA as required and consistently touting its attributes, Nissan created a false narrative that permeated the public sphere. Had Nissan not actively concealed the CVT Defect in such a manner, dealers would have been forced to disclose the Defect and/or cease selling the Class Vehicles, and the Defect would otherwise have become publicly known to Plaintiffs and Class Members. If Nissan's advertisements or marketing materials had accurately disclosed the CVT Defect, it is likely that the Defect would have been sufficiently widely reported that Plaintiffs and Class Members would also have learned about the Defect through exposure to such materials, materials viewed at dealerships, and/or in conversations with salespeople at dealerships prior to purchase.

78.     Hence, any applicable statute of limitation, if any, has been tolled by Nissan's knowledge, active concealment, and denial of the facts alleged herein. Nissan is further estopped from relying on any statute of limitation because of its concealment of the defective nature of the Class Vehicles and their CVTs.

## VIII.   CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes and Subclasses pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

80.     The Classes and Subclasses are defined as:

**Nationwide Class:** All persons or entities who purchased or leased any MY2015-2021 Nissan Murano vehicle in the United States.

**California Subclass:** All members of the Nationwide Class who purchased or leased any MY2015-2021 Nissan Murano vehicle in the State of California.

**CLRA Subclass:** All members of the California Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**Massachusetts Subclass:** All members of the Nationwide Class who purchased or leased any MY2015-2021 Nissan Murano vehicle in the State of Massachusetts.

**Maryland Subclass:** All members of the Nationwide Class who purchased or leased any MY2015-2021 Nissan Murano vehicle in the State of Maryland.

**Florida Subclass:** All members of the Nationwide Class who purchased or leased any MY2015-2021 Nissan Murano vehicle in the State of Florida.

81.     Excluded from the Classes and Subclasses are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiffs reserve the right to amend the Class definitions, and to add further subclasses, if discovery and further investigation reveal that the Class and subclasses should be expanded or otherwise modified.

82.     **Numerosity:** Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.  The Class Members are readily identifiable from, *inter alia*, information and records in Defendants' possession, custody, or control.

83.     **Typicality:** The claims of the representative Plaintiffs are typical of the claims of the Classes and Subclasses in that the representative Plaintiffs, like all Class Members, paid for a Class Vehicle designed, manufactured, and distributed by Defendants which is subject to the CVT Defect.  The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that he has incurred or will incur the cost of repairing or replacing his malfunctioning continuously variable transmission and related parts as a result of the CVT Defect.  Further, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of fraudulent, deliberate, and/or grossly negligent misconduct resulting in injury to all Class Members.

84.     **Commonality:** There are numerous questions of law and fact common to Plaintiffs and the Classes and Subclasses that predominate over any question affecting only individual Class Members.  These common legal and factual questions include the following:

a.      whether the Class Vehicles suffer from the CVT Defect;

b.      whether the CVT Defect constitutes an unreasonable safety hazard;

c.      whether Defendants know about the CVT Defect and, if so, how long Defendants have known of the Defect;

d.      whether the defective nature of the Class Vehicles' CVT constitutes a material fact;

e.      whether Defendants had and have a duty to disclose the defective nature of the Class Vehicles' CVT to Plaintiffs and the other Class Members;

f.      whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g.      whether Defendants knew or reasonably should have known of the CVT Defect contained in the Class Vehicles before they sold or leased them to Class Members; and

h.      whether Defendants are liable for the consumer protection, common law and warranty claims asserted herein.

85.    **Adequate Representation:**  Plaintiffs will fairly and adequately protect the interests of the Class Members.  Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

86.    **Predominance and Superiority**:  Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.  Class treatment of common questions

of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION

**Violation of Mass. Gen. Laws Ch. 93A §§ 2, *et seq*.,**
**on behalf of the Nationwide Class and, in the alternative, the Massachusetts Subclass**

87. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

88. Plaintiff Luz Pineda brings this cause of action on behalf of herself and the Nationwide Class, or in the alternative, on behalf of the proposed Massachusetts Subclass.

89. The Massachusetts Regulation of Business Practice and Consumer Protection Act prohibits unfair and deceptive acts or practices in the conduct of trade or commerce. Mass. Gen. Laws L. ch. 93A, § 2(a).

90. Nissan, Plaintiff Pineda, and Class Members are "persons" within the meaning of ch. 93A, § 1(b).

91. Nissan engaged in "trade" or "commerce" within the meaning of ch. 93A, § 1(b).

92. Plaintiff Pineda and Class members are consumers who purchased or leased a Class Vehicle for end use and not for resale.

93. Defendant's conduct, as described above, including omitting and concealing that Class Vehicles contained defective transmissions, constitutes an unfair and deceptive practice and was likely to mislead a reasonable consumer.

94. A reasonable consumer would consider the quality of the transmission in a Class Vehicle, and the defective nature of the CVT, to be important when making a decision whether to purchase a Class Vehicle. The disclosure of the CVT Defect would have influenced prospective buyers not to enter into the transaction.

95. Nissan knew before the time of sale to Plaintiff Pineda and Class Members, that Class Vehicles were produced with defective CVTs that posed a serious safety threat to drivers,

passengers, and everyone else sharing the road with Class Vehicles. Through consumer complaints, knowledge of design and production of the CVTs, internal product testing, and past experience with defective CVTs, Defendant learned of the CVT Defect. The existence and ubiquity of the Defect is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide. Defendant's issuance of a series of TSBs directed to Class Vehicles' CVTs and CVTs in prior models and related vehicles shows actual knowledge.

96. Nissan's conduct in concealing the CVT Defect and failing to offer necessary repairs to Plaintiff Pineda and Class Members so that their vehicles would not suffer from the Defect constituted unfair conduct within the meaning of Mass. Gen. Laws ch. 93A §§ 2, *et seq*.

97. Nissan's conduct, as alleged herein, is in violation of at least the following regulations promulgated by the Massachusetts Attorney General under ch. 93A:

a. 940 C.M.R. § 3.02 (prohibiting, among other things, statements or illustrations used in advertisements which create a false impression of the grade, quality, value, or usability of the product offered);

b. 940 C.M.R. § 3.05(1) (prohibiting claims or representations "made by any means concerning a product which, directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect");

c. 940 C.M.R. § 3.08(2) (providing that it "shall be an unfair and deceptive act or practice to fail to perform or fulfill any promises or obligation arising under a warranty"); and

d. 940 C.M.R. § 3.16(2) (providing that it is a violation of ch. 93A, § 2 to "fail to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer to enter into the transaction").

98. As a direct and proximate result of Nissan's unfair and deceptive conduct, as alleged herein, Plaintiff Pineda and Class Members have suffered injury-in-fact, including the following:

a.      Plaintiff Pineda and Class Members, in purchasing the Class Vehicles, received a car worth less than as represented in that they paid for a car with a smooth, fully operable transmission, free of defects, but did not receive that which they paid for;

b.      Plaintiff Pineda and Class Members suffered diminution in value of the Class Vehicles due to the existence of the CVT defects in their Class Vehicles; and

c.      Plaintiff Pineda and Class Members were faced with the choice or repairing their Class Vehicles at substantial cost and inconvenience or being without their vehicles at substantial cost and inconvenience.

99.     As a result of Defendant's unfair and deceptive conduct in violation of ch. 93A, Plaintiff Pineda and Class Members have suffered actual damages, including the cost to replace their defective CVTs which, on information and belief, averages in the range of $3,500, property damage to the CVT itself, the additional cost they paid for a vehicle with a working and defect-free transmission (but did not receive), diminution in value of the Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

100.    Had Plaintiff Pineda and the other Class Members been aware of the omitted and misrepresented facts, *i.e.*, that the Class Vehicles they purchased were defective and would cost them several thousands of dollars when the transmission prematurely failed, Plaintiff Pineda and the other Class Members would not have purchased the Class Vehicles or would have paid significantly less for them than they actually paid.

101.    On October 4, 2022, Plaintiff Pineda sent to Nissan a written demand for relief pursuant to ch. 93A, § 9(3).  Nissan confirmed receipt but failed to make a reasonable offer of relief in response to the demand.

102.    Pursuant to Mass. Gen. Law, ch. 93A, § 9, Plaintiff Pineda and Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial; (b) statutory damages in the amount of $25 for each violation; and (c) appropriate

equitable relief, including injunctive relief. Because Nissan's conduct was committed willfully and knowingly, Plaintiff Pineda and Class members are entitled to recover up to three times their actual damages, but no less than two times actual damages.

103.    Plaintiff Pineda and Class Members also seek an order directing Nissan to correct its violations by repairing or replacing the defective CVTs on all Class Vehicles.

## SECOND CAUSE OF ACTION

### Breach of Implied Warranty, Mass. Gen. Laws Ch. 106 §§ 2-314, *et seq.*, on behalf of the Nationwide Class and, in the alternative, the Massachusetts Subclass

104.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

105.    Plaintiff Luz Pineda brings this cause of action on behalf of herself and the Nationwide Class and, in the alternative, the Massachusetts Subclass.

106.    Class Vehicles are "goods" and Nissan is a "seller" and "merchant" within the meaning of Mass. Gen. Laws Ch. 106, § 2-314.

107.    Plaintiff Pineda is the intended user and true consumer of the Class Vehicle that she purchased from an authorized Nissan dealership. She used her vehicle as intended by Nissan and in a manner that was foreseeable.

108.    The implied warranty of merchantability included with the sale of each Class Vehicle means that Nissan warranted that each Class Vehicle: (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Class Vehicle would be used; and (c) conformed to the promises or affirmations of fact made on the container or label.

109.    The Class Vehicles are not adequately labeled because their labeling fails to disclose the Defect and does not advise consumers of the existence of the danger prior to experiencing the CVT Defect firsthand.

110.    Nissan's actions have deprived Plaintiff Pineda and Class Members of the benefit of their bargain and have caused Class Vehicles to be worth less than what Plaintiff and other Class Members paid.

111.    As a direct and proximate result of Nissan's breach of implied warranty, Class Members received goods whose condition substantially impairs their value. Plaintiff Pineda and Class Members have been damaged by the diminished value of their Class Vehicles.

112.    Plaintiff Pineda and Class Members are entitled to actual damages, including all incidental and consequential damages, resulting from Nissan's breach of the implied warranty.

### THIRD CAUSE OF ACTION

**Violation of the Maryland Consumer Protection Act, Md. Code Com. Law §§ 13-101 *et seq*, on behalf of the Nationwide Class and, in the alternative, the Maryland Subclass**

113.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

114.    Plaintiff Travis Beaver brings this cause of action on behalf of himself and on behalf of the proposed Nationwide Class and, in the alternative, the Maryland Subclass.

115.    Nissan is a "person" as that term is defined in Md. Code, Commercial Law section 13-101(H).

116.    Plaintiff Beaver, and Class Members, are "consumers" as that term is defined in Md. Code Com. Law § 13-101(C)(1).

117.    As described above, Nissan sold vehicles to Plaintiff Beaver and Class Members even though the vehicles are defective and pose a safety hazard.  Nissan failed to disclose its knowledge of the CVT Defect and its attendant risks at the point of sale or otherwise.

118.    Nissan's deceptive acts and practices were willful and knowing because, as alleged above, Nissan has known about the CVT Defect for many years before it began selling Class Vehicles and chose not to disclose the problem to consumers.

119.    Despite its knowledge of the CVT Defect, Nissan chose to conceal information about the defect from Plaintiffs and other consumers.  This concealment was misleading and

unfair in a material respect because the information concealed, if known, would impact the purchasing decision of a reasonable consumer. Had Plaintiff Beaver—or any reasonable consumer—been told that the Class Vehicles contained the CVT Defect, they would not have purchased his Class Vehicle or would have paid less for it.

120.    Because Nissan did not disclose the CVT Defect, however, Plaintiff Beaver and Class Members have been deprived of the benefit of their bargain and harmed in that they now own defective and unsafe vehicles that have diminished value compared to the non-defective vehicles they intended to purchase. The CVT is one of the most complex and expensive components in Plaintiff's vehicle; on information and belief, the average cost of a CVT replacement is in the range of $3,500. This is a cost that Plaintiff will have to bear as the price of continued ownership of a defective vehicle. The CVT is a critical component that is material to the driver experience and safety. The CVT Defect has therefore also diminished the value of Plaintiff's vehicle.

121.    As a direct and proximate result of Nissan's deceptive acts or practices, Plaintiff Beaver and Maryland Class Members have suffered and will continue to suffer actual damages unless Nissan compensates them for the cost of repair or the Class Vehicles' diminished value.

122.    Because Nissan's willful and knowing conduct caused injury to Plaintiff Beaver and Class Members, they seek recovery of actual damages in an amount necessary to repair the CVT Defect in Class Vehicles or compensate them for the diminished value caused by the existence of the CVT Defect, discretionary punitive damages, reasonable attorneys' fees and costs, and an order enjoining Nissan's deceptive conduct, and any other just and proper relief available under Md. Code Com. Law §§ 13-101 *et seq.*

## FOURTH CAUSE OF ACTION

**Breach of Implied Warranty, Md. Code Com. Law §§ 2-314, 2-315, on behalf of the Nationwide Class and, in the alternative, the Maryland Subclass**

123.    Plaintiff Travis Beaver re-alleges the paragraphs above as if fully set forth herein.

124. Class Vehicles are "goods" and Nissan is a "seller" and "merchant" within the meaning of Md. Code Com. Law § 2-314.

125. The implied warranty of merchantability included with the sale of each Class Vehicle means that Nissan warranted that each Class Vehicle (a) would pass without objection in trade under the contract description; (b) was fit for the ordinary purposes for which the Class Vehicle would be used; and (c) conformed to the promises or affirmations of fact made on the container or label.

126. The Class Vehicles are not adequately labeled because their labeling fails to disclose the Defect and does not advise the members of the proposed Maryland Subclass of the existence of the danger prior to experiencing failure firsthand.

127. Nissan's actions have deprived Plaintiff and the members of the proposed Maryland Subclass of the benefit of their bargains and have caused Class Vehicles to be worth less than what Plaintiff and other members of the proposed Maryland Subclass paid.

128. As a direct and proximate result of Nissan's breach of implied warranty, members of the proposed Maryland Subclass received goods whose condition substantially impairs their value. Plaintiff Beaver and members of the proposed Maryland Subclass have been damaged by the diminished value of their Class Vehicles.

129. Plaintiffs and Class Members notified Defendants of the breach within a reasonable time and/or were not required to do so. Plaintiff Beaver notified Nissan of the breach by letter on October 4, 2022.

130. Plaintiff Beaver and members of the proposed Maryland Subclass are entitled to damages and all incidental and consequential damages resulting from Honda's breach.

## FIFTH CAUSE OF ACTION

**Breach of Express Warranty on behalf of the Nationwide Class and, in the alternative, the Maryland Subclass**

131. Plaintiff Travis Beaver re-alleges the paragraphs above as if fully set forth herein.

132.     Plaintiff Travis Beaver brings this claim on behalf of the Nationwide Class and, in the alternative, the Maryland Subclass.

133.     Each Class Vehicle sold by Nissan included a written express warranty that covered CVT and warranted that it would repair or replace any defects in materials and workmanship in the Class Vehicles.

134.     Nissan provided all purchasers and lessees of the Class Vehicles with a written New Vehicle Limited Warranty that "begins on the date the vehicle is delivered to the first retail buyer or put into use, whichever is earlier." Under the Warranty's Powertrain Coverage, Nissan expressly warranted that the Warranty "covers any repairs needed to correct defects in materials or workmanship." The Warranty's Powertrain Coverage covers the Nissan-branded Class Vehicles for 60 months or 60,000 miles, whichever comes first.  Nissan promised to cover listed powertrain components under its Warranty, including the transmission components such as the "[t]ransmission and [t]ransaxle [c]ase and all internal parts, torque converter and converter housing, automatic transmission control module, transfer case and all internal parts, seals and gaskets, clutch cover and housing, A/T cooler, and electronic transmission controls."

135.     Nissan breached its warranties by offering for sale and selling defective vehicles that did not conform to the warranty and refusing to recognize or permanently repair the defect, thereby subjecting the occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury.

136.     While his vehicle was still within Nissan's 60,000-mile and 60-month warranty limitations, Plaintiff Beaver notified an authorized Nissan dealer that his vehicle was exhibiting symptoms consistent with the CVT Defect.  The dealer, however, did not offer a repair or replacement.

137.     Plaintiff Beaver further notified Nissan directly that his vehicle suffered from the CVT Defect on October 4, 2022.

138.     By failing to offer a suitable repair or replacement, Nissan has breached its obligations to repair or replace Plaintiff Beaver's vehicle under the express warranty.

139. Nissan's breach has harmed Plaintiff Beaver and Class Members by subjecting them and any occupants of the Class Vehicles purchased or leased to damages and risks of loss and injury and requiring them to pay out of pocket to repair the Class Vehicles' CVTs.

140. Nissan's warranty to repair the Class Vehicles fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class Members whole because Nissan has been unable to repair the defect or has refused to replace the transmission with a different, functional transmission. As Nissan's Technical Service Bulletins demonstrate, Nissan is incapable of repairing the defect, despite repeated attempts to do so.

141. Accordingly, Plaintiffs and Class Members are not limited to the limited warranty of "repair" and Plaintiffs and Class Members seek all remedies allowed by law.

142. Plaintiffs and the Class or, in the alternative, the Maryland Subclass seek full compensatory damages allowable by law, attorneys' fees, costs, punitive damages, restitution, the repair or replacement of all Class Vehicles, the refund of money paid to own or lease all class vehicles , and appropriate equitable relief including injunctive relief, a declaratory judgment, and a court order enjoining Nissan's wrongful acts and practices, and any other relief to which Plaintiffs and the Maryland Subclass may be entitled.

## SIXTH CAUSE OF ACTION

**Violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. §§ 501.201, *et seq*., on behalf of the Nationwide Class and, in the alternative, the
Florida Subclass**

143. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

144. Plaintiff Altobelli brings this cause of action on behalf of herself and on behalf of the proposed Nationwide Class or, in the alternative, the Florida Subclass.

145. Plaintiff Altobelli and members of the proposed Florida Subclass are "consumers" and "interested parties or persons" under the FDUTPA. Fla. Stat §§ 501.203(6) and (7).

146. Nissan is engaged in the conduct of "trade or commerce" as defined by FDUTPA. Fla. Stat § 501.203(8).

147. By failing to disclose and concealing the CVT Defect from Plaintiffs and Class Members, Nissan engaged in "unfair or deceptive acts or practices in the conduct of . . . commerce" in violation of Fla. Stat § 501.204.

148. Nissan's conduct, as described above and below, constitutes a violation of Fla. Stat § 501.204. Furthermore, Nissan's deceptive acts and practices, which were intended to mislead consumers who were in the process of purchasing and/or leasing the Class Vehicles, constitute conduct directed at consumers.

149. Nissan knew that the Class Vehicles suffered from the CVT Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

150. In failing to disclose the CVT Defect, Nissan knowingly and intentionally concealed material facts and breached its duty not to do so, thereby engaging in deceptive acts or practices within the meaning of the FDUTPA.

151. Nissan's acts and practices, which were intended to result, and which did result, in the sale of defective Class Vehicles, violated the FDUTPA because:

a. Nissan represented that its vehicles had characteristics, uses, or benefits which they do not have;

b. Nissan advertised its goods with intent not to sell them as advertised;

c. Nissan represented that its vehicles are of a particular standard, quality, or grade when they are not;

d. Nissan represented that transactions (*i.e.*, the sale of the Class Vehicles) conferred or involved rights, remedies, or obligations which they do not; and

e. Nissan failed to disclose and concealed material information about its vehicles.

152. As described above, Nissan sold and leased vehicles to proposed Florida Subclass Members with a known CVT Defect that endangers drivers and materially detracts from the central functionality of the vehicles. Nissan failed to disclose its knowledge of the CVT Defect and its attendant risks at the point of sale or otherwise, realizing that warning about the CVT Defect would dissuade Class Members from purchasing and leasing the vehicles.

153.     Had Nissan not actively concealed and instead adequately disclosed the CVT Defect, Plaintiff Altobelli and Class Members would not have purchased or would have paid less for their vehicles.  Through at least July 2020 Ms. Altobelli brought her vehicle at for maintenance inspection at regular service intervals to authorized Nissan dealers (Harbor Nissan in Port Charlotte, Florida and Coral Springs Nissan in Coral Springs, Florida).  On information and belief, these dealers never informed Ms. Altobelli that her vehicle had a defective CVT because Nissan has counseled its dealers to actively conceal the CVT Defect.

154.     Plaintiffs also assert a violation of public policy arising from Nissan's withholding of material safety facts from consumers.  Nissan's violation of consumer protection and unfair competition laws resulted in harm to consumers.

155.     Nissan's deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

156.     As a direct and proximate result of Nissan's deceptive acts or practices, Plaintiff Altobelli and Florida Subclass Members have suffered and will continue to suffer actual damages. Because Nissan's willful and knowing conduct caused injury to Plaintiff Altobelli and Class Members, they seek recovery of actual damages, discretionary punitive damages, reasonable attorneys' fees and costs, and an order enjoining Nissan's deceptive conduct, and any other just and proper relief available under Fla. Stat § 501.211 and § 501.2105.

<u>**SEVENTH CAUSE OF ACTION**</u>

**Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq*., on behalf of the Nationwide Class and, in the alternative, the California Subclass**

157.     Plaintiff Susanne Hanes brings this cause of action on behalf of herself and on behalf of the proposed Nationwide Class or, in the alternative, the California Subclass.

158.     Plaintiff Hanes hereby incorporates the preceding allegations as if fully set forth herein.

159.     Plaintiff Hanes and California Subclass Members are "buyers" within the meaning of the Song-Beverly Consumer Warranty Act, California Civil Code § 1791(a).

160. Nissan is a "manufacturer" within the meaning of the Song-Beverly Consumer Warranty Act, California Civil Code § 1791(j).

161. Plaintiff's and the class members' vehicles are "consumer goods" within the meaning of Song-Beverly Consumer Warranty Act, California Civil Code § 1791(a).

162. Nissan's Warranty is an "express warrant[y]" within the meaning of Song-Beverly Consumer Warranty Act, California Civil Code § 1791.2.

163. At all relevant times, Nissan manufactured, distributed, warranted, and/or sold the Class Vehicles. Nissan knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

164. Nissan provided an implied warranty to Plaintiff Hanes and the California Subclass Members, which warranted that the Class Vehicles, including the components parts, are merchantable and fit for the ordinary purposes for which they were sold. However, inter alia, the transmissions in the Class Vehicles suffer from an inherent defect at the time of sale and, thereafter, are not fit for their ordinary purpose of providing reasonably safe and reliable transportation.

165. Nissan impliedly warranted that the Class Vehicles are of merchantable quality and fit for such use. The implied warranty includes, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, distributed, and/or sold by Nissan are safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles are fit for their intended use.

166. Contrary to the applicable implied warranties, the Class Vehicles, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiff Hanes and California Subclass Members with reliable, durable, and safe transportation. Instead, the transmissions in Class Vehicles are defective and suffer from transmission failures that compromise the reliability, durability, and safety of Class Vehicles.

167. As a result of Nissan's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles have suffered an ascertainable loss of money, property, and/or value

of their Class Vehicles. Additionally, as a result of the transmission defect, Plaintiff Hanes and California Subclass Members were harmed and suffered actual damages in that the Class Vehicles' transmission are substantially certain to fail or have failed before their expected useful life has run. The transmission failures create a high risk of accidents, injuries, and even death.

168. Nissan's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use, in violation of California Civil Code §§ 1792 and 1791.1, *et seq*.

169. Plaintiff Hanes and the California Subclass seek full compensatory damages allowable by law, attorneys' fees, costs, the repair or replacement of all Class Vehicles the refund of money paid to own or lease all Class Vehicles, and any other relief to which Plaintiffs, the California Subclass may be entitled.

## EIGHTH CAUSE OF ACTION

### Violation of California's Consumers Legal Remedies Act, California Civil Code §§ 1750, *et seq*., on behalf of the Nationwide Class and, in the alternative, the CLRA Subclass

170. Plaintiff Susanne Hanes brings this claim individually and on behalf of the CLRA Subclass.

171. Plaintiff Hanes hereby incorporates the preceding allegations as if fully set forth herein.

172. Defendant Nissan North America, Inc. is a "person" as defined by California Civil Code § 1761(c).

173. Plaintiff Hanes and the CLRA subclass members are "consumers" within the meaning of California Civil Code §1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

174. By failing to disclose and concealing the defective nature of the transmissions from Plaintiff Hanes and the prospective Class and CLRA Subclass Members, Nissan violated California Civil Code § 1770(a), as they represented that the Class Vehicles and their transmissions had characteristics and benefits that they do not have and represented that the Class

Vehicles and their transmissions were of a particular standard, quality, or grade when they were of another. See Cal. Civ. Code §§ 1770(a)(5) & (7).

175. Nissan's unfair and deceptive acts or practices occurred repeatedly in Nissan's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

176. Nissan knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively manufactured or contained defective materials, and were not suitable for their intended use and as a result of the defect known to Nissan as alleged herein, created an unreasonable safety risk for Class Members.

177. As a result of their reliance on Nissan's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the transmission defect, Plaintiff Hanes and the Class and CLRA Subclass Members were harmed and suffered actual damages in that the Class Vehicles' transmission or transmission components are substantially certain to fail or have failed before their expected useful life has run.

178. Nissan had a duty to Plaintiff Hanes and the Class and CLRA Subclass

179. Members to disclose the defective nature of the transmissions and/or the associated repair costs because:

a. Nissan was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

b. Plaintiff Hanes and the Class and CLRA Subclass Members could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

c. Nissan knew that Plaintiff Hanes and the Class and CLRA Subclass Members could not reasonably have been expected to learn of or discover the safety defect.

180. In failing to disclose the defective nature of the transmissions, Nissan knowingly and intentionally omitted material facts and breached its duty not to do so.

181.     The facts about the transmission defect that Nissan concealed from or failed to disclose to Plaintiff Hanes and the Class and CLRA Subclass Members are material in that a reasonable purchaser or lessee would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them. Had Plaintiff Hanes and the Class and CLRA Subclass Members known that the Class Vehicles' transmissions were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

182.     Plaintiff Hanes and the Class and CLRA Subclass Members are reasonable purchasers and lessees who do not expect the transmissions installed in their vehicles to exhibit the aforementioned transmission failures.

183.     As a result of Nissan's conduct, Plaintiff Hanes and the Class and CLRA Subclass Members were harmed and suffered actual damages in that the Class Vehicles experienced and may continue to experience the aforementioned transmission failures. As a direct and proximate result of Nissan's unfair or deceptive acts or practices, Plaintiff Hanes and the Class and CLRA Subclass Members suffered and will continue to suffer actual damages.

184.     Plaintiff Hanes sent Nissan a letter on August 16, 2022 by United States Postal Service Certified Mail that provided notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). Nissan has failed to provide appropriate relief for their violations of the CLRA within thirty days, as required by the statute.

185.     Therefore, Plaintiff Hanes and the CLRA Subclass Members, or, alternatively, the Class Members, seek full compensatory and punitive damages allowable by law, the repair or replacement of all Class Vehicles the refund of money paid to own or lease all Class Vehicles monetary, and injunctive and equitable relief, along with any other remedies available by law.

186.     Plaintiffs' counsel's Declaration of Venue, to the extent required under California Civil Code section 1780(d), is attached hereto as **Exhibit 4**.

## NINTH CAUSE OF ACTION

**Violation of California's Business & Professions Code §§ 17000, *et seq*.,
on behalf of the Nationwide Class and, in the alternative, the California Subclass**

187.    Plaintiff Susanne Hanes brings this claim individually and on behalf of the Nationwide Class and, in the alternative, the California Subclass.

188.    Plaintiff Hanes hereby incorporates the preceding allegations as if fully set forth herein.

189.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

190.    Reasonable purchasers and lessees, such as Plaintiff Hanes and the Class and California Subclass Members do not expect their transmissions to exhibit problems such as shaking, juddering, shuddering, jerking, delayed acceleration, and, eventually, complete transmission failure.

191.    Nissan knew the Class Vehicles and their transmissions suffered from inherent defects, were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use and created an unreasonable safety risk.

192.    In failing to disclose the defects with the transmission, Nissan knowingly and intentionally concealed material facts and breached its duty not to do so.

193.    By their conduct, Nissan has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

194.    Nissan had a duty to Plaintiff Hanes and the Class and California Subclass

195.    Members to disclose the defective nature of the Class Vehicles and their transmissions because:

a.      Nissan was in a superior position to know the true facts about the safety defect in the Class Vehicles' transmissions;

b.     Nissan made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles and their transmissions; and

c.     Nissan actively concealed the defective nature of the Class Vehicles and their transmissions from Plaintiff Hanes and the Class and California Subclass.

196.   The facts regarding the transmission defect that Nissan concealed from or failed to disclose to Plaintiff Hanes and the Class and California Subclass are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles.  Had Plaintiff Hanes and the Class and California Subclass Members known that the Class Vehicles' transmissions were defective and posed a safety hazard, then Plaintiff Hanes and the Class and California Subclass Members would not have purchased or leased Class Vehicles equipped with transmissions, or would have paid less for them.

197.   Nissan continues to conceal the defective nature of the Class Vehicles and their transmissions even after Class Members began to report problems.

198.   Nissan's conduct was and is likely to deceive customers.  Nissan's unfair or deceptive acts or practices occurred repeatedly in Nissan's trade or business and were capable of deceiving a substantial portion of the purchasing public.

199.   Nissan's acts, conduct and practices were unlawful, in that they constituted:

a.     Violations of the California Consumer Legal Remedies Act;

b.     Violations of the Song-Beverly Consumer Warranty Act;

c.     Violations of the express warranty provisions of California Commercial Code section 2313; and

d.     Violations of the other causes of action set forth in this Complaint.

200.   As a result of their reliance on Nissan's omissions and/or misrepresentations, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the transmission defect, Plaintiff Hanes and the Class and California Subclass Members were harmed and suffered actual damages

in that the Class Vehicles' transmission and/or transmission components are substantially certain to fail before their expected useful life has run.

201. As a direct and proximate result of Nissan's unfair and deceptive practices, Plaintiff Hanes and the Class and California Subclass have suffered and will continue to suffer actual damages.

202. Nissan has been unjustly enriched and should be required to make restitution to Plaintiff Hanes and the Class and California Subclass pursuant to §§ 17203 and 17204 of the Business & Professions Code.

203. Plaintiff Hanes and the California Subclass, or, in the alternative, the Class, seek all remedies available pursuant to §§ 17070, *et seq*. of the Business & Professions Code, including full compensatory damages allowable by law, attorneys' fees, costs, the repair or replacement of all Class Vehicles the refund of money paid to own or lease all Class Vehicles, appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining Nissan's wrongful acts and practices, and any other relief to which Plaintiff and the California Subclass may be entitled.

## TENTH CAUSE OF ACTION

### Fraudulent Omission
### on behalf of the Nationwide Class and, in the alternative, the California Maryland, Massachusetts, and Florida Subclasses

204. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

205. Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class and, in the alternative, the California, Maryland, Massachusetts, and Florida Subclasses.

206. Defendants knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured and were not suitable for their intended use.

207. Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles and their CVTs. Defendants knew that the CVT is one of the Class Vehicle's primary components and is fundamental to the safe and reliable operation

of the Class Vehicles, like an engine. A vehicle cannot operate with out a transmission, and Plaintiffs, like any reasonable consumer, would not have knowingly purchased vehicles with defective transmissions. The CVT Defect thus went to the essence of the purchase transaction.

208. Defendants had multiple opportunities to disclose the CVT Defect to Plaintiffs and Class Members. Defendants could have included a disclosure on the Monroney label that accompanies all new vehicles. Defendants also could have included a disclosure on the Nissan website and, in the Press Kit that Nissan typically releases in connection with each new model year vehicle, as well as in Nissan's other advertising across the Internet, television and print. Nissan could also have instructed its dealers to post and advisement concerning the CVT Defect on all CVT-equipped Nissan vehicles offered for sale. As discussed above, if Nissan's advertisements or marketing materials had accurately disclosed the CVT Defect, it is likely that the Defect would have been sufficiently widely reported that Plaintiffs and Class Members would also have learned about the Defect through exposure to such materials, materials viewed at dealerships, and/or in in conversations with salespeople at dealerships prior to purchase.

209. Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles' CVTs because:

a. Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' CVTs;

b. Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that their CVTs have a dangerous safety defect until after they purchased or leased the Class Vehicles;

c. Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn about or discover the CVT Defect prior to purchase or lease; and

d. Defendants actively concealed the defective nature of the Class Vehicles' CVTs from Plaintiffs and Class Members at the time of sale and thereafter.

210. The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in

deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles' CVTs, they would not have purchased or leased them, or would have paid less for them.

211.    Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles' CVTs in order to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendants' omissions to their detriment.

212.    Defendants continued to conceal the defective nature of the Class Vehicles' transmissions even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

213.    As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages.

214.    Plaintiffs and Class Members are entitled to actual damages, exemplary damages, appropriate equitable relief as well as attorneys' fees and expenses as a result of Defendants' fraudulent conduct.

## **ELEVENTH CAUSE OF ACTION**

### **Unjust Enrichment**
**on behalf of the Nationwide Class and, in the alternative, the California, Maryland, Massachusetts, and Florida Subclasses**

215.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

216.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class and, in the alternative, the California Maryland, Massachusetts, and Florida Subclasses.

217.    As described above, Nissan sold vehicles to Class Members even though the vehicles are defective and pose a safety hazard, and Nissan failed to disclose its knowledge of the CVT Defect and its attendant risks at the point of sale or otherwise.

218.    As a direct and proximate result of Nissan's failure to disclose known defects, Nissan has profited through the sale and lease of the Class Vehicles. Although these vehicles are

purchased through Nissan's agents, the money from the vehicle sales flows directly back to Nissan.

219.    As a result of its fraudulent acts and omissions related to the CVT Defect, Nissan charged Plaintiffs and Class Members more than it otherwise could have for Class Vehicles, obtaining monies which rightfully belong to Plaintiffs and Class Members.

220.    Additionally, as a direct and proximate result of Nissan's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that have and will continue to confer an unjust and substantial benefit upon Nissan.

221.    Nissan has been unjustly enriched through the sale and repair of Class Vehicles which it brought to market knowing they suffered from the CVT Defect.  Nissan has obtained money from Plaintiffs' and Class Members, and earned interest on that money which have added to Nissan's profits, when that money should have remained with Plaintiffs and Class Members.

222.    Nissan's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

223.    As a result of Nissan's unjust enrichment, Plaintiffs and Class Members have suffered damages.

## **TWELVETH CAUSE OF ACTION**

**Breach of Written and Implied Warranty Under Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*  on behalf of the Nationwide Class and, in the alternative, the Massachusetts, Maryland and California Subclass**

224.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

225.    Plaintiffs Luz Pineda, Travis Beaver and Susan Hanes bring this cause of action on behalf of herself and on behalf of the Nationwide Class and, in the alternative, the Massachusetts, Maryland, and California Subclasses.

226.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

227.     Defendants are "supplier(s)" and "warrantor(s)" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

228.     The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

229.     Defendants' implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

230.     Defendants' New Vehicle Limited Warranty and Powertrain Coverage Warranties are written affirmations made in connection with the sale of the Class Vehicles and constitute "written warranties" pursuant to 15 U.S.C. § 2301(6).

231.     Defendants breached the implied and written warranties that apply to the Class Vehicles by virtue of the above-described acts.

232.     Plaintiffs Pineda, Beaver and Hanes and Class Members notified Defendants of the breach within a reasonable time and/or were not required to do so.  Defendants were also on notice of the CVT Defect from, among other sources, the complaints and service requests they received from Class Members and their dealers.

233.     Defendants' breach of the implied and written warranties deprived Plaintiffs and Class Members of the benefits of their bargains.

234.     As a direct and proximate result of Defendants' breach of the implied and written warranties, Plaintiffs Pineda, Beaver and Hanes and the other Class Members sustained damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiffs and the other Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, and costs, including statutory attorney fees and/or other relief as appropriate.

**RELIEF REQUESTED**

235.     Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter judgment against Defendants, and issue an order providing the following relief:

a.      certifying the proposed Class and Subclasses, designating Plaintiffs as a named representatives of the Classes, and designating the undersigned as Class Counsel;

b.      a declaration that Nissan is financially responsible for notifying all Class Members about the defective nature of the CVT in the Class Vehicles;

c.      an order directing Defendants to provide notice, in a form pre-approved by the counsel identified below, to all current owners or lessees of the Class Vehicles, and in the said notice offer to replace the defective CVT contained in every Class Vehicle with a non-defective CVT;

d.      an order directing Defendants to provide notice, in a form pre-approved by the counsel identified below, to all current owners and lessees of the Class Vehicles, of an appropriate warranty extension of the Class Vehicles' CVT and related components;

e.      an order directing Defendants to offer reimbursement to all current and former owners and lessees of the Class Vehicles, for all expenses already incurred as a result of the CVT Defect, including but not limited to repairs, diagnostics, and any other consequential and incidental damages (*e.g.* towing charges, vehicle rentals, etc.);

f.      an order directing Defendants to immediately cease the sale and leasing of the Class Vehicles at authorized Nissan dealerships nationwide without first notifying the purchasers of the CVT Defect, and to otherwise immediately cease to engage in the violations of law as set forth above;

g.      damages and restitution in an amount to be proven at trial;

h.      any and all remedies provided pursuant to the state consumer protection laws, implied warranty laws, and under common law fraud and unjust enrichment;

i.      an award to Plaintiffs and the Class of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

j.      that Defendants disgorge, for the benefit of the Class, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, and/or make full restitution to Plaintiffs and Class Members;

k.     an award of attorneys' fees and costs, as allowed by law;

l.     an award of pre-judgment and post-judgment interest, as allowed by law;

m.     leave to amend the Complaint to add further subclasses and to conform to the evidence produced at trial; and

n.     such other relief as may be appropriate under the circumstances.

## **DEMAND FOR A JURY TRIAL**

236.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

DATED:  February 16, 2023                    Respectfully submitted,


                                             */s/ J. Gerard Stranch, IV*
                                             J. Gerard Stranch, IV (BPR 23045)
                                             Benjamin A. Gastel (BPR 28699)
                                             **BRANSTETTER, STRANCH**
                                             **   & JENNINGS PLLC**
                                             223 Rosa L. Parks Avenue, Suite 200
                                             Nashville, Tennessee 37203
                                             Phone: 615-254-8801
                                             Fax: 615-255-5419
                                             gerards@bsjfirm.com
                                             beng@bsjfirm.com

                                             Mark Greenstone (*pro hac vice*)
                                             Benjamin Donahue (*pro hac vice* )
                                             **GREENSTONE LAW APC**
                                             1925 Century Park East, Suite 2100
                                             Los Angeles, California 90067
                                             Telephone: (310) 201-9156
                                             Facsimile: (310) 201-9160
                                             mgreenstone@greenstonelaw.com
                                             bdonahue@greenstonelaw.com

                                             Gregory F. Coleman
                                             Adam A. Edwards
                                             William A. Ladnier
                                             **MILBERG COLEMAN BRYSON**
                                             **PHILLIPS GROSSMAN, PLLC**
                                             800 South Gay Street, Suite 1100
                                             Knoxville, TN 37929
                                             Telephone: (865) 247-0080
                                             Facsimile: (865) 522-0049
                                             gcoleman@milberg.com
                                             aedwards@milberg.com
                                             wladnier@milberg.com

Tarek H. Zohdy (*pro hac vice* )
Cody R. Padgett (*pro hac vice* )
Laura H. Goolsby (*pro hac vice* )
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com

Lawrence Deutsch (*pro hac vice* )
Jeffrey L. Osterwise (*pro hac vice* )
**BERGER & MONTAGUE, P.C.**
1818 Market Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
rpaul@bm.net
ldeutsch@bm.net
josterwise@bm.net

Melissa S. Weiner (*pro hac vice* )
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, MN 55319
Telephone: (612) 389-0600
Facsimile: (612) 389-0610
mweiner@pwfirm.com

Michael H. Pearson (*pro hac vice* )
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
mpearson@pwfirm.com

James C. Shah (*pro hac vice* )
Natalie Finkelman Bennett
**MILLER& SHAH, LLP**
1845 Walnut Street, Suite 806
Philadelphia PA 19103
Telephone: (610) 891-9880
jcshah@millershah.com
nfinkelman@millershah.com

Norberto J. Cisneros (*pro hac vice* )
Barbara M. McDonald (*pro hac vice* )
**MADDOX & CISNEROS, LLP**
1210 South Valley View Boulevard, Suite 202
Las Vegas, NV 89102
Telephone: (702)366-1900
Facsimile: (702) 366-1999
ncisneros@mic-law.com

*Attorneys for Plaintiffs, the Class, and the
Subclasses*

## CERTIFICATE OF SERVICE

       I hereby certify that a true and correct copy of the foregoing First Amended Class Action Complaint was served on the party listed below via first class mail, postage prepaid, unless said party is a registered CM/ECF participant who has consented to electronic notice, and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party:

John S. Hicks
BAKER DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN 37203
jhicks@bakerdonelson.com

E. Paul Cauley, Jr. (*pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
1717 Main Street, Suite 5400
Dallas, Texas 75201
(469) 357-2500
paul.cauley@faegredrinker.com

This the 16th day of February, 2023.

                        */s/ J. Gerard Stranch, IV*
                        J. GERARD STRANCH, IV